[Cite as *In re W.B.*, 2017-Ohio-8780.]

STATE OF OHIO        )               IN THE COURT OF APPEALS
                        )ss:         NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN    )

IN RE: W.B.                       C.A. No.     17CA011121

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    15JC44939

DECISION AND JOURNAL ENTRY

Dated: December 4, 2017

---

SCHAFER, Judge.

{¶1} Appellant, Taunia B. ("Mother"), appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor child in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

{¶2} Mother is the biological mother of W.B., born October 8, 2001. The child's father ("Father") did not attend the permanent custody hearing and did not appeal from the trial court's judgment.

{¶3} Mother suffers from multiple sclerosis and has been confined to a wheelchair since W.B. was an infant. Mother and Father had resided together in West Virginia but moved to Northeast Ohio so Mother could receive better medical treatment. Mother is unable to care for herself without assistance. Mother had an in-home caregiver for a period of time, but she later

moved into a nursing home and has resided in different nursing homes throughout most of this case. Mother and Father later divorced. Shortly afterward, Father remarried and has had little involvement with W.B.

{¶4} This case originally began in March 2014 with a complaint for legal custody filed by the adult half-sister of W.B. The sister, T.F., alleged that the parents had left the child with her more than two weeks earlier because they could not provide a safe and healthy environment for the child. W.B. was placed in the emergency temporary custody of T.F. Mother and Father later agreed to T.F. having temporary custody of W.B.

{¶5} While W.B. was living with T.F., he sexually assaulted both of her children. W.B. was adjudicated a delinquent child and placed in a juvenile detention and treatment facility. W.B. also disclosed that he had been exposed to pornography, inappropriate sexual behavior, and that he had been the victim of sexual assaults while living with Mother and Father.

{¶6} For 17 months, W.B. resided in a residential treatment facility for juvenile sex offenders and victims, where he attended school, participated in individual and group counseling, and lived in a highly structured and secure environment. Before his release from the facility, a safety plan was developed to provide him with clear rules, guidelines, and structure to enable him to live safely and appropriately outside of the facility. W.B. would require an increased level of supervision for the foreseeable future to minimize the risk of him sexually acting out or otherwise engaging in inappropriate behavior.

{¶7} Because LCCS was concerned about W.B.'s need for ongoing sexual offender treatment and intensive supervision, and that he had been exposed to inappropriate sexual and/or abusive behavior and was not properly supervised while living with his parents, it filed a

dependency and neglect complaint while W.B. was in the treatment facility. W.B. was later adjudicated a neglected and dependent child and placed in the temporary custody of LCCS.

{¶8}    After his release from the treatment facility, W.B. was ultimately placed in the home of a foster parent who had also fostered and later adopted another juvenile sex offender. The adopted son had completed a similar detention and treatment program and, after his release from the facility, he had been subject to similar rules and structure to prevent him from reoffending. W.B. did well in the structured environment of the foster home.

{¶9}    Although Mother and W.B. shared a family bond and loved each other, LCCS remained concerned that Mother lacked the ability to provide W.B. with the necessary level of supervision to prevent him from reoffending. In addition to Mother's physical and financial limitations, she failed to appreciate the severity of W.B.'s problems and his need for ongoing structure, supervision, and accountability for his behavior. Mother had failed to supervise W.B. while he lived in her home and recently told one of W.B.'s counselors that she would not report him if he behaved inappropriately.

{¶10}   On September 9, 2016, LCCS moved for permanent custody of W.B. Following a hearing, the trial court terminated Mother's parental rights and placed W.B. in the permanent custody of LCCS. Mother appeals and raises two assignments of error, which will be addressed together for ease of review.

II.

## Assignment of Error I

**The trial court committed reversible error in taking judicial notice of its own investigation and referral team program and the services it provided.**

**Assignment of Error II**

**The trial court committed reversible error by allowing a children services caseworker to testify about records that were not in evidence.**

**{¶11}** Mother does not challenge the trial court's permanent custody decision on the merits but instead argues that the trial court committed reversible error by taking judicial notice of its referral team program in W.B.'s delinquency case and by considering brief hearsay testimony of the LCCS caseworker about Mother's involvement in prior children services cases in West Virginia and Cuyahoga County. To establish reversible error, however, Mother must demonstrate not only that the trial court erred in considering the evidence but also that she suffered prejudice as a result. *In re T.Z.*, 9th Dist. Summit No. 28595, 2017-Ohio-7592, ¶ 22.

**{¶12}** Even if the trial court erred in considering this evidence, Mother has failed to argue or demonstrate any resulting prejudice. Although the trial court briefly referred to this evidence in its 31-page decision, the evidence had little relevance to the trial court's judgment and there was overwhelming properly-admitted evidence before the trial court to support its permanent custody decision.

**{¶13}** Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child in a parent's custody has been adjudicated abused, neglected, or dependent on three separate occasions; or the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based

on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶14} The trial court found that LCCS established the first prong of the permanent custody test for alternative reasons, including that W.B. had been in the temporary custody of LCCS for at least 12 months of a consecutive 22-month period. *See* R.C. 2151.414(B)(1)(d). That finding was fully supported by the record.

{¶15} The trial court also found that permanent custody was in the best interest of W.B. When determining the child's best interest under R.C. 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, the child's wishes and custodial history, and the need for permanence in the child's life. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11.

{¶16} Mother visited W.B. during this case and no one disputed that she loved her child and wanted to be able to care for him. Nevertheless, W.B. needed a caregiver who understood his problems with sexually acting out and would provide him with intensive structure and supervision to allow him to live safely and appropriately outside the detention facility. Several witnesses expressed concern that Mother was unable to provide W.B. with the level of structure and supervision that he required to prevent him from sexually reoffending.

{¶17} One of W.B.'s counselors expressed concern that he admittedly lied to Mother and took advantage of her physical limitations. While he had lived with Mother, because W.B. knew that she could not follow him around the house, he went to other floors of the house and had been able to sneak out of the house and frequently used a computer to access pornography.

{¶18} W.B.'s interaction with his foster father and foster brother had been in compliance with the safety plan. W.B.'s probation officer believed that the foster father was providing W.B.

with appropriate stability and structure to minimize the risk of him reoffending. The foster father had also demonstrated the ability to implement a sexual offender safety plan with his adopted son. W.B. had been abiding by the rules of the safety plan and was doing well there.

{¶19} The foster father explained that structuring the boys' days was the key. He allowed them very little "down time" so they would not have time to make inappropriate decisions. As W.B. had proven that he was trust-worthy, he had earned some privileges, such as the ability to walk to school. Because W.B. had been in his home for only a few months, the foster father had not yet committed to adopting him but was willing to consider adoption. The foster father had facilitated a continuing relationship between his adopted son and the child's biological family and would likely do the same with W.B. and Mother, if their interaction was appropriate.

{¶20} The guardian ad litem testified that W.B. was conflicted about where he wanted to live. W.B. realized that remaining in his current foster home was in his best interest, however, because Mother lacked the ability to provide him with the level of supervision and accountability that he required. The guardian ad litem, who had been serving as a court-appointed advocate for 23 years, testified that he wished he could "clone" a person like W.B.'s foster father because he had done such a wonderful job with W.B. and his adopted son. W.B. had adapted well to the structure in that home, he was excelling in school, and was otherwise "flourishing" in the foster home.

{¶21} By the time of the hearing, W.B. had not lived with Mother for almost three years. Mother was still residing in a nursing home and admittedly had no home for W.B. to return to. Mother lacked the physical ability to provide for her own needs and did not have a local support system, as most of her family lived in West Virginia. W.B. was in need of a legally secure

permanent placement with a high level of structure and layers of accountability to prevent him from reoffending. The trial court reasonably concluded that W.B. had found such a placement in the foster home and that permanent custody was in his best interest. Mother's assignments of error are overruled.

## III.

**{¶22}** Mother's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

HENSAL, P. J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and PREETHI KISHMAN, Assistant Prosecuting Attorney, for Appellee.

JEANNETTE ROBINSON, Attorney at Law, for Appellee.

MICHAEL TOWNE, Guardian ad Litem.